IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | } | |
| | } | |
| JTS Trucking LLC, | } | Case No. 20-40423-JJR11 |
| | } | |
| Debtor. | } | |

---

| | | |
|---|---|---|
| JTS Trucking LLC, | } | |
| | } | |
| Plaintiff, | } | |
| v. | } | AP No. 22-40024-JJR |
| | } | |
| Atlantic Southern Construction, Inc.; | } | |
| KRH Properties, LLC; and | } | |
| Jason Cahela, | } | |
| | } | |
| Defendants. | } | |

## MEMORANDUM OPINION

The Debtor, JTS Trucking LLC ("JTS") filed this proceeding to compel the release of an improperly filed lis pendens that clouded the title of certain real property belonging to the estate (the "Property"), as well as to pursue damages including additional interest and attorney fees necessitated by the "failure of [the Defendants] to satisfy the improper Lis Pendens." (AP Doc. 1, prayers for Counts I and II.) The complaint asserted the court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, as well as 11 U.S.C. § 1142. The complaint further asserted the issues in this adversary proceeding are core under 28 U.S.C. § 157(b)(2)(A), (b)(2)(L), and (b)(2)(O). (AP Doc. 1 ¶¶ 18, 19.) The Defendants' answer as to the jurisdictional assertions of the complaint said, "Defendants do not confirm nor deny." (AP Doc. 16 ¶¶ 18, 19.) The report of parties (AP Doc. 18) showed that all parties agreed the issues in the proceeding are core, and all parties consented to the entry of final orders by this court, subject to normal appellate review under 28 U.S.C. § 158. The

court agrees with the parties that the issues raised in this proceeding are core and that this court has jurisdiction to enter final orders. The following constitute the court's findings of fact and conclusions of law for this proceeding, which was tried on the facts without a jury, as required by Fed. R. Bankr. P. 7052.

**FINDINGS OF FACT.**

The factual history between the parties has been set out in AP 20-40013-JJR (the "Remanded AP") and will not be repeated here in great detail except as pertinent. In April 2018, Atlantic Southern Construction, Inc. ("Atlantic Southern"), which is wholly owned and controlled by Jason Cahela ("Cahela"), filed a complaint against JTS and its co-owner John Lowden seeking damages and injunctive relief for an alleged trespass. (AP Doc. 1, Ex. C.) A year and a half later, Cahela took it upon himself to file a lis pendens (the "LP," AP Doc. 1, Ex. B filed Nov. 27, 2019) on behalf of Atlantic Southern against the Property. Cahela filed the LP without consulting Atlantic Southern's counsel in the trespass case. (Pltf. Ex. 6, Cahela Dep. 18:1-19:1.)

The LP succeeded in dissuading more than one contracted buyer and the inability to sell the Property and pay off the mortgage was a major factor leading to the filing of the chapter 11 case. Susan Lowden, one of the owners of JTS, testified that the improperly filed LP caused JTS to lose in December 2019 its last prepetition sale contract with a potential purchaser for $350,000.00. (Tr. 20:14-21:25; AP Doc. 79.) Consequently, unable to service the mortgage debt and being unable to sell the property because of the LP, JTS sought bankruptcy relief.

JTS filed the underlying chapter 11 case in March 2020 and timely removed the state court trespass case to this court as the Remanded AP. This court ultimately sent the Remanded AP back to state court for resolution. In its Remand Opinion (AP 20-40013 Doc. 46), this court pointed out that under Alabama law, it is not proper to file a lis pendens when the underlying cause of action

2

is the in personam tort of trespass, including a continuous trespass. Cahela and Atlantic Southern did not heed that caution and the LP remained of record.[1]

In the meantime, while the trespass suit continued in state court following remand, JTS proposed a liquidation chapter 11 plan (BK Doc. 173) that this court confirmed on November 3, 2021 (BK Doc. 192). The confirmed plan provided for the sale of the Property, as the estate's primary asset available for liquidation and distribution to creditors. After losing on summary judgment as to both defendants at the trial level in the remanded trespass case, Cahela and KRH pursued an appeal. In early 2022, undeterred by the confirmed plan, and knowing that JTS was trying to sell the Property (Cahela Dep. 22:12-23:5), Cahela and his companies continued the LP's interference with the Property's title. Cahela reached out to at least three potential purchasers and had a conversation with another who visited his office. (Cahela Dep. 20-22.) He threatened the potential purchasers with whom he spoke that they would be buying themselves into a lawsuit if they purchased the Property. (Cahela Dep. 21-24.)

While the legal basis for adding any such purchaser to the existing in personam trespass suit against the Debtor is unclear, Cahela candidly admitted he made the threat to do so more than once.[2] Cahela, as the person in control of the entity that owned the adjoining property, actively

---

[1] Eventually, the trespass claim in the Remanded AP was decided in favor of JTS and John Lowden in the state court. (Def. Ex. 5, Certificate of Judgment in favor of JTS and its co-owner John Lowden affirmed with no opinion by the Supreme Court of Alabama on March 10, 2023 and that judgment certified on March 29, 2023.) As evidenced on the Certificate of Judgment issued by the state supreme court, KRH Properties, LLC ("KRH") had been substituted as the real party in interest in lieu of Atlantic Southern. (*See also* Doc. 1, Ex.A showing the motion to substitute was filed May 21, 2021.) KRH is owned and controlled by Cahela, as is Atlantic Southern.

[2] Cahela's threat of litigation was not an idle one. On the day before the trial in this proceeding, Cahela caused KRH to file a complaint in state court in Marshall County naming JTS, its co-owner John Lowden, and the purchaser of the Property through the court-approved sale as defendants. (Pltf. Ex. 14 and Def. Ex. 6.) Cahela testified the claims in the new complaint are all grounded in the same operative facts and prepetition events and actions that were the basis of the Remanded AP trespass complaint, but were not included as he believes now they should have

3

discouraged anyone from considering buying the Property from JTS. Cahela was upset that the purchasers were not being told about the trespass suit when the reason he caused Atlantic Southern to file the LP was because he wanted something of record to let purchasers know the trespass suit had been filed and wanted it to show up on a title search. (Tr. 42-43.) Cahela was familiar and even friendly with a couple of the potential purchasers he contacted: " I told them it was – I would not buy it because they'd be in a lawsuit. . . . And I thought they should know that they were going to be a party to the lawsuit. I didn't want them being surprised when they got the – named in the lawsuit." (Cahela Dep. 27: 8-16.) When asked if his intent in filing the LP was to cloud JTS's title to the Property, Cahela stated his intent was not necessarily to cloud the title but to put the world on notice of the fact that he had filed the lawsuit containing his trespass claim. (Cahela Dep. 19: 1-18.) He intended to notify "[a]nybody. Lowden, everybody, the bank. . .Of course I did it on purpose." (Cahela Dep.19:7-10.) Although less than candid in his deposition when asked about clouding the title, Cahela admitted in deposition and at trial that he knew Atlantic Southern had no claim against the Property itself when the LP was filed (the complaint seeking only damages and injunctive relief for in personam trespass) and he also knew that the LP would in fact cloud title and make a sale difficult. (Cahela Dep. 28:14-15; Tr. 43:16-20.) The cloud on the title to impair the sale of the Property was exactly what Cahela intended when he personally prepared and filed the LP over a year after the trespass suit was filed and without the advice of his counsel in that suit.³

---

been. (Tr. 33:1-35:9.) Res judicata issues aside, no party has asked this court to consider the propriety of that filing.

³ According to his deposition testimony, which was closer in time to the events and which the court finds more credible than his conflicting trial testimony on this point, Cahela did not seek the advice of his attorney in the underlying suit before filing the LP. (Cahela Dep. 19:1.)

4

Despite Cahela's efforts to dissuade potential purchasers by threatening to sue them and despite the LP, JTS at last contracted a buyer under the plan's sale provision (as modified to allow for a private sale at BK Doc. 228) for a sales price of $445,000.00. This court conducted a hearing on the notice of sale and motion to sell (together the "Sale Motion," BK Docs. 219 and 220) on April 21, 2022. At the April 21, 2022 hearing on the Sale Motion, counsel for JTS informed the court that the Defendants agreed the LP had been or would be voluntarily released, thereby removing a cloud on the title and allowing the Debtor to convey marketable title to the purchaser without the need for a sale free and clear of liens under § 363(f). The Defendants' counsel attended the hearing telephonically and confirmed the agreement by an email to the Debtor's attorney, explaining that he had trouble unmuting to make an announcement on the record but that the agreement to release was correctly stated on the record. (Pltf. Ex. 8.)

The order authorizing the sale of the Property (the "Sale Order") was prepared by counsel for JTS and as agreed with Defendants' counsel, recited that the LP had already been released. (BK Doc. 229; Pltf. Ex.2; entered May 16, 2022.) The Sale Order explicitly provided that any claim Atlantic Southern or KRH may have had against JTS as a result of the claims underlying the Remanded AP would only be recoverable as provided for in the chapter 11 plan (the appeal of the Remanded AP was not yet final, so that a reversal on appeal leading to a ruling against JTS on the trespass claim remained a possibility at that time in May 2022). Counsel for the Defendants made the representation that the LP had been or would immediately be released based upon the fact that the release of the LP had been discussed between Cahela and his counsel, had been prepared by counsel, and had been picked up by Cahela who then signed it on behalf of Atlantic Southern on May 4, 2022, prior to the submission of the Sale Order. (Tr. 41:17-25; Pltf. Ex.3.)

5

Despite having agreed to record the release, which was relied upon and recited in the Sale Order, Cahela did not do so. Thus, the cloud on the title continued and delayed the sale of the Property pursuant to this court's authorization. The Debtor filed the instant adversary proceeding in November 2022 to compel the release of the LP. In the Defendants' joint answer (AP Doc. 16), Cahela blamed a secretary for not recording the release after he signed it in May 2022, and averred that he only realized it had not been recorded when he became aware of this adversary proceeding in November 2022. The answer further averred that Cahela found the executed but unrecorded release of the LP in the secretary's desk after his attorney contacted him following receipt of the summons and complaint, immediately had it recorded, having fired the secretary (whom he claimed had also embezzled funds). (AP Doc. 16, ¶¶ 15-16.)

Cahela's trial testimony on this issue again contradicted his prior assertions. Cahela testified that when his attorney informed him of this proceeding having been filed in late November 2022, Cahela went to the Marshall County probate office to find what he believed to be the already-recorded release. Failing to find it of record, he "issued another one" and recorded it immediately. (Tr. 42:8-20.) This testimony that the release was somehow recreated in late November or early December 2022 is contradicted by the date of execution of the release and the notarization thereon being May 4, 2022. (Def. Ex. 3.) The release was at last recorded on December 5, 2022. (Def. Ex. 3.) The sale pursuant to the plan and as approved by the court for a sales price of $445,000.00 closed on January 26, 2023. (Pltf. Ex. 4.) In the meantime, the Debtor incurred (1) attorney fees to enforce the agreement for the release of the LP; (2) the additional accrual of interest on its mortgage which would have been earlier paid if the Debtor could have conveyed title unclouded by the improperly recorded LP; and (3) attorney fees seeking to collect the damages claimed in (1) and (2). (Pltf. Exs. 13, 15.)

## LAW AND CONCLUSIONS

As this court pointed out in its Remand Opinion and reiterated at the close of the evidence (Tr. 55:13-18), the LP should never have been filed because the underlying cause of action made no claim whatsoever to or against the Property itself but was an in personam tort claim for trespass against JTS and one of its owners. (Remand Opinion, Doc. 46 in AP 20-40013 (citing *Eustace v. Wilbourn*, 357 So. 3d 647, 654 (Ala. Civ. App. 2020)). Alabama law on the circumstances under which a lis pendens may be filed is well-established:

> It is clear from the language of § 35–4–131(a), Ala.Code 1975, that lis pendens notices can be filed regarding real property *that is the subject of litigation:*
>
>> "When any civil action or proceeding shall be brought in any court *to enforce any lien upon, right to or interest in, or to recover any land,* ... the person ... commencing such action or proceeding ... shall file with the judge of probate of each county where *the* land or any part thereof is situated a notice containing the names of all of the parties to the action or proceeding, ... a description of *the* real estate and a brief statement of the nature of the lien, writ, application, or action sought to be enforced."
>
> (Emphasis added.) *See also Willis v. Lewis,* 25 Ala.App. 369, 370, 148 So. 330, 331 (1933) ("The doctrine of lis pendens is for the purpose of preserving the property involved in the suit...."); and *Ex parte State Dep't of Revenue,* 886 So.2d 817, 821 (Ala.Civ.App.2003) (" 'The sole purpose of a lis pendens notice is to afford notice to a bona fide purchaser who might purchase the property during the pendency of the action.' Although a lis pendens is only a notice of the pending litigation affecting title to real property, 'it renders title unmarketable and therefor[e] effectively prevents the property's transfer until the litigation is resolved or the lis pendens is expunged.' " (citations omitted)).

*Chamblee v. Duncan*, 188 So. 3d 682, 692 (Ala. Civ. App. 2015). There has been no argument in support of the LP's propriety, and certainly no credible evidence in support of its filing. Count I of the complaint in the instant proceeding sought an order compelling the release of the LP. That relief is now moot, the release having since been filed.

7

Case 22-40024-JJR    Doc 83    Filed 02/01/24    Entered 02/01/24 15:11:14    Desc Main
Document    Page 7 of 16

Count II of the complaint sought damages caused by the malicious and improper filing of the LP, which is the tort of slander of title under Alabama Code § 6-5-211 (1975)[4], including damages that resulted from the continuing slander after the failure to release the LP as agreed, which then necessitated the filing of this proceeding. Slander of title occurs when a filer records a lis pendens and asserts a lien both falsely and maliciously. *Taylor v. Baldwin Nat'l Bank*, 473 So. 2d 489, 491 (Ala. 1985). The proof required for any slander of title recovery consists of:

> (1) Ownership of the property by plaintiff; (2) falsity of the words published; (3) malice of defendant in publishing the false statements; (4) publication to some person other than the owner; (5) the publication must be in disparagement of plaintiff's property or the title thereof; and (6) that special damages were the proximate result of such publication (setting them out in detail.)

*Bebee Prop., LLC v. Ard*, 241 So. 3d 719, 727 (Ala. Civ. App. 2017) (quoting *Merchants Nat'l Bank of Mobile v. Steiner*, 404 So. 2d 14, 21 (Ala. 1981) (quoting *Womack v. McDonald*, 121 So. 57, 59 (Ala. 1929))).

First, there is no dispute that JTS held ownership of the Property at the time Cahela filed the LP. The second element of falsity is satisfied because, as Cahela knew at the time he caused the LP to be filed, Atlantic Southern had asserted no claim whatsoever against the Property itself in the trespass complaint. Thus, the assertion of a claim against the Property in rem via the recorded LP was indisputably false when published.

The third element of malice, however, is a more nuanced determination and requires an assessment of the filer's "motive, intent, and subjective feelings and reactions." *Taylor,* 473 So. 2d at 492 (citations omitted). Malice exists when the filer knows there is not even a colorable claim against the property itself in the underlying action. *Id.* Cahela's knowledge is crucial to the

---

[4] "The owner of any estate in lands may commence an action for libelous or slanderous words falsely and maliciously impugning his title." Alabama Code § 6-5-22 (1975).

finding of malice. Cahela admitted he knew that Atlantic Southern had asserted no claim against the Property itself when the LP was filed. He admitted he knew that the LP would "cloud the [deed]" (Tr. 14:16-20) and seemed proud of the fact that his filing the LP prevented the sale of the Property and created problems for JTS leading to bankruptcy. He filed the LP without his counsel's advice well after his counsel filed the Remand AP complaint. Cahela was motivated to publish the LP because he wanted the world to know that he had a trespass suit seeking money damages and injunctive relief against JTS and its co-owner, for the express purpose of dissuading any buyers. He also personally threatened multiple potential purchasers that they would be buying a lawsuit if they bought the Property, all while knowing Atlantic Southern had asserted no claim against the Property itself in the Remanded AP.[5] Cahela delayed filing the release of the LP even though this court signaled that it should never have been filed in its Remand Opinion, and despite his counsel having informed him that it had to be released and having prepared the release, which Cahela had picked up from the attorney and signed but delayed filing.

Cahela followed through on filing the release only after his attorney was served with the summons and complaint in this proceeding. His testimony regarding the delay in recording the release and the timing of the release's execution contradicted the reasons set out in the Answer as well as the timing shown on the face of the release. The court concludes that Cahela was aware at

---

[5] Cahela had every right to take his trespass case all the way to the Alabama Supreme Court following this court's Remand Order, and he did so, whereupon the supreme court rejected his position in total, affirming summary judgment in favor of JTS and John Lowden. But what he had no legal right to do was to falsely and maliciously cloud JTS's title to the Property while pursuing the trespass claim as far as he could pursue it. The underlying trespass claim in the Remanded AP in no way justified the LP being filed in the first instance, much less the delay in releasing it while Cahela's company pursued an appeal of the order against it on the merits. And the court's conclusion that the LP was filed and maintained with malice would not change even had the appeal been successful—Alabama law simply does not countenance the filing of a lis pendens when the underlying action seeks only in personam tort damages or in personam injunctive relief.

all times that the LP release had not been recorded back in May 2022, and that he had no intent to do so until the issue was forced.⁶ Considering his years'-long campaign to pursue JTS and its co-owner personally, and most significantly because Cahela acknowledged that he knew his company never had a claim against the Property itself, it is difficult to imagine a clearer case of malice. The evidence not only supports but compels this court's conclusion that the LP was filed – and was not released until this proceeding was filed – with malice by Cahela on behalf of Atlantic Southern and KRH to the extent KRH was substituted as the real party in interest for the Remanded AP trespass lawsuit referenced in the LP.⁷

The fourth element of publication is satisfied by the fact that Cahela filed the LP in the probate records of Marshall County, Alabama, for the explicit purpose of giving notice to everybody. The LP so recorded created a cloud on JTS's title to the Property exactly as Cahela knew and intended, thus satisfying the fifth element as well. Finally, JTS suffered damages as a result of the publication as discussed in greater detail below. Accordingly, the court concludes that Cahela, Atlantic Southern, and KRH under Cahela's direction slandered JTS's title to the

---

⁶ It is not clear whether Cahela's intent in filing and then failing to release the LP was to preserve the Property as an asset of JTS from which Cahela could collect an in personam judgment or whether his intent was simply to inflict as much turmoil on JTS and its co-owner as he possibly could as retribution for the alleged trespass, or some combination of the two.

⁷ The record does not disclose the reasoning of the state court in allowing the substitution of KRH as the real party in interest, but it was done at the request of Atlantic Southern and apparently after Atlantic Southern transferred to KRH ownership of the adjoining property. The state court could have decided that because the complaint alleged a continuous trespass claim, the new owner should proceed as the party personally damaged by the alleged tort. (Motion to Name Real Party in Interest at AP Doc. 1, Ex. A.) The ownership of the adjacent property was apparently transferred from Atlantic Southern to KRH at some point after the LP was filed but before May 21, 2021, when the Motion to name KRH the real party in interest was filed. There was no evidence that KRH was involved in the filing of the LP initially, but KRH indisputably became the real party in interest in the underlying suit purportedly justifying the LP and explicitly referenced on the face of the LP, well prior to the LP's release in December 2022. At all relevant times, both entities were under Cahela's exclusive control.

Property when the LP was filed on November 27, 2019, and continued the slander even after agreeing to release the LP. The slander abated only when the LP release was finally filed on December 5, 2022.

**DAMAGES**

The direct damages calculation for sales lost as a result of the slander of title prior to the bankruptcy petition would be the amount by which the sales price ultimately achieved was less than the value of the property plus other consequential or special damages and attorney fees. In the case of *Phillips v. Epic Aviation, LLC*, 234 F. Supp. 3d 1174, 1215 (M.D. Fla. 2017), cited by both sides in their briefs, a creditor held a money judgment against the debtor but knew there was no claim against the debtor's property. Nonetheless, the creditor had filed improper lis pendens that falsely, knowingly, and intentionally asserted an interest in the debtor's real property, thus slandering the debtor's title. The debtor was unable to sell its property despite making effort to do so because the lis pendens clouded title. *Id.* at 1213. In a lengthy opinion applying Florida law, the court found there were no direct damages because the value of the property increased while the improper lis pendens was filed. However, the court did award consequential damages, which damages included mortgage interest, property tax, and other expenses that were necessarily incurred in the ownership of the property while the lis pendens clouded title and prevented a sale.

The court then offset those consequential damages against the increase in the value of the property during that same time period. *Id.* at 1214-15. Finally, the court awarded attorney fees incurred "related to the dissolution of the lis pendens and the proceedings before [multiple courts on appeal.]" *Id.* at 1215. The court explicitly rejected the argument that attorney time for appellate work was not compensable and notably, the attorney fee award was not offset against the increase in the property's value. *Id*; *cf. Mantiply v. Horne (In re Horne)*, 876 F.3d 1076 (11th Cir. 2017)

(damages for attorney fees incurred to end a stay violation properly include attorney fees incurred prosecuting the action for damages, including on appeal, even after the stay violation has abated).

This court is persuaded by the analysis of the court in *Phillips*, although admittedly it was decided under Florida and not Alabama law. There is no dispute that the final sale price of $445,000.00 for the Property in the chapter 11 case was $95,000.00 more than the $350,000.00 contract price that failed to close in December 2019 because of the LP. The accrual of additional mortgage interest that would have been avoided had the sale closed in December 2019, computed through the court's entry of the Sale Order on May 16, 2022, is an additional $36,454.08 in consequential damages ($36,454.08, calculated as 897 days at $40.64 per diem).[8] Those damages are offset against the increase in value and are not recoverable.

JTS, however, is nonetheless entitled to recover the further damages that were caused by the continuing slander of title even after May 16, 2022, while the unreleased LP continued to interfere with the Debtor's ability to promptly close the sale that had not merely been contracted but had been approved by this court pursuant to the confirmed chapter 11 plan and the Sale Order. Those damages include the additional mortgage interest of $8,249.92 that accrued on its mortgage following the date of the Sale Order through the date the release of the LP was finally recorded on Dec. 5, 2022 (203 days at $40.64 per diem). The court will not offset the interest accrued during that time against the increase in value because to do so would reward the Defendants for refusing to perform as agreed and as represented to the court at the hearing on the Sale Motion and in the Sale Order. To rule otherwise would incentivize any creditor (or as in this case, a party who by the

---

[8] Plaintiff's Ex. 13 was supported by Ms. Lowden's credible unrebutted testimony about the mortgage debt and the simple-interest accrual thereunder and shows the per diem interest accrual on the mortgage obligation secured by the Property was $40.64, with no intervening credits to the debt.

12

time of the Sale Order had been adjudicated by the state court to have no claim at all against the debtor, much less against its property) to refuse to perform as announced to the court and to delay compliance with the court's orders for as long as desired with no financial consequence accruing so long as any equity in the underlying property had not been completely eroded. To protect against gamesmanship in the contravention of court orders, and for the same reasons that underlie the collateral source rule in tort claims in general whereby a tortfeasor should not be given the benefit of having committed a tort,[9] the court will allow without offset the mortgage interest damages of $8,249.92 that accrued from the date of the Sale Order through the release of the LP.

Additionally, JTS is also entitled to its attorney fees incurred to pursue the release of the improperly filed LP. In reaching this conclusion, the court was guided not only by the analysis in *Phillips*, but also by the facts and holding of *Chamblee v. Duncan*, 188 So. 3d 682, 893 (Ala. Civ. App. 2015). In the *Chamblee* case, the original action was filed by an attorney (Chamblee) on behalf of the original plaintiffs, who claimed the original defendants (one of whom was Duncan) had improperly cut timber across the original plaintiffs' property line. Chamblee filed lis pendens notices contemporaneously with the complaint in two different counties, asserting therein a claim against all real property owned by Duncan. The lis pendens notices were discovered as part of a title search when Duncan tried to sell a piece of property, and Duncan's counsel repeatedly demanded that Chamblee release the lis pendens, pointing out that the lis pendens notices were

---

[9] *See, e.g., Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1310-1311 (11th Cir. 2020) ("'The collateral-source rule is an exception to the general rule of damages preventing a double recovery by an injured party, or in other words, it is an exception to the general rule that in a tort action, the measure of damages is that that will compensate and make the plaintiff whole.' [quoting 26 C.J.S Damages § 189]. … Moreover, the rule is understood to avoid discouraging plaintiffs from prudently paying for insurance by limiting their recoveries, and it deters negligence by punishing tortfeasors for the full amount of their wrongdoing." (internal citations omitted)).

13

entirely improper, there being no claim against real property in the original action. Chamblee refused to respond.

Eventually, the state court held a hearing on an emergency motion to quash the lis pendens, and in response, Chamblee agreed that the lis pendens notices were improper and invalid. Chamblee nevertheless refused to release the lis pendens because he reasoned that he did not need to release a document that was invalid. The lis pendens were quashed and the sale eventually closed, and Duncan asserted a claim against Chamblee for "abuse of process, malicious prosecution, negligence, wantonness, slander of title, and civil conspiracy." *Id*. at 692. All of those claims "were based on their assertion that Chamblee had improperly filed, and had refused to withdraw, the lis pendens notices." *Id.* Duncan sought damages for reputational harm and anguish, as well as medical expenses from heart issues and hospitalization caused by the stress of the closing delay as a result of the lis pendens, and sought an award for attorney fees incurred to have the lis pendens quashed.

The trial court awarded compensatory damages as well as punitive damages based in part on its finding of wantonness, but without specifying which theory supported the punitive damages award. The appeals court affirmed the punitive damages award because even though the trial court did not specify if the damages resulted from the slander of title or the separate wantonness claim, "[b]y his own admission, Chamblee consciously and intentionally refused to withdraw the lis pendens notices after he had determined that they had been improperly filed." *Id.* at 694 (finding no error in the trial court's award of punitive damages under Ala. Code § 6-11-20(b)). The appeals court found the evidence supported the trial court's award of compensatory damages for mental anguish, medical expenses, and reputational harm because of the improper filing of the lis pendens.

14

Significantly, the court also upheld the award of attorney fees incurred in having the lis pendens notices quashed. *Id.* at 693.

The motive, knowledge, and actions of Chamblee in filing the improper lis pendens and refusing to release them closely mirrors the motive, knowledge, and actions of Cahela and the companies under his control. While JTS has not requested punitive damages, this court has no trouble concluding that attorney fees incurred in pursuit of the release of in improper lis pendens are an element of compensatory damages for the slander of title under Alabama law, as was the case in *Chamblee*. And although a demand for release was made in the facts of the *Chamblee* case, nothing in that case or any other case cited by the parties or found in the court's own research implies or establishes that a demand for release is *required* before one can recover damages for the slander of title.

This court also finds JTS is entitled to its attorney fees incurred in pursuing this proceeding to judgment, despite the LP having been released after this proceeding was filed and served. The court concludes that the work performed by JTS's counsel as shown on Plaintiff's Ex. 12 was caused by the slander of title committed by Cahela on behalf of Atlantic Southern in pursuit of its claims in the Remanded AP, to which interest KRH succeeded. The work performed by JTS's counsel was necessary to clear the LP from clouding title to the Property and allow the sale under the plan, as Cahela and his companies through counsel had agreed. The time entries for which recompense is sought begin on April 20, 2022, which was the day before the hearing on the Sale Motion, and the first entry recites, "Phone call with Cahela atty, does not have a lien on property and does not oppose the sale." The court concludes the time records are sufficiently contemporaneous and detailed and accepts the expert testimony offered at trial as well as its own experience in concluding that the work done was necessary and rate charged was reasonable, as

15

were the expenses. An award of attorney fees in the amount of $10,960.00 and expenses in the amount of $289.34 is appropriate. The total damages and attorney fee award of $19,499.26 (consisting of $8,249.92 mortgage interest damages following the Sale Order, plus $10,960.00 for reasonable attorney fees and $289.34 for necessary expenses) will be awarded against each of the Defendants jointly and severally. The court will enter a separate judgment in conformity with this Opinion.

Done this 1st day of February 2024.

/s/ James J. Robinson
JAMES J. ROBINSON
U.S. BANKRUPTCY JUDGE